## DECLARATION

I state under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1. I, Bennett Strickland, am a contractual Civil Healthcare Fraud Investigator with the United States Attorney's Office – Eastern District North Carolina. I have been in this role since September 23, 2025. Prior to this, I was a Special Agent with Internal Revenue Service – Criminal Investigation Division for 20 years, having retired at the end of March 2025. In October 2005, I successfully completed Special Agent Basic Training at the Federal Law Enforcement Training Center ("FLETC") and subsequently moved to the field to investigate crimes against the tax code, money laundering, and the Bank Secrecy Act. I worked heavily in joint agency programs such as the Organized Crime Drug Enforcement Task Force ("OCDETF") as well as with several other Federal, State, and Local law enforcement agencies. Prior to becoming a Special Agent I worked in the private sector as an Auditor, Accountant, and Financial Analyst. Additionally, I successfully passed the Maryland Certified Public Accountancy in 1998. I am also a Certified Anti-Money Laundering Specialist and have testified as a money laundering expert witness at two trials.

2. The information contained in this declaration is known to me through involvement in the investigation, my background, training, and experience, and information provided by other individuals, confidential source(s), investigators, and agencies involved in this investigation, including the Department of Health & Human Services – Office of Inspector General.

3. Since this declaration is being submitted for the limited purpose of seeking forfeiture of certain real property connected to an ongoing investigation, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to support a reasonable belief that the government will meet its burden of proof at trial that the defendant property should be forfeited.

### Purpose of the Declaration

4. This affidavit is made in support of a complaint seeking forfeiture of the following real property (the "Subject Property"):

> **5200 Blue Stem Ct.** – All that certain lot or parcel of land known as 5200 Blue Stem Court, Raleigh, Wake County, North Carolina 27606, with all appurtenances and improvements thereon, more particularly described as follows:

GOVERNMENT
EXHIBIT

2

BEING ALL OF LOT 98, ENCHANTED OAKS, SECTION II, PHASE III ACCORDING TO PLAT RECORDED IN BOOK OF MAPS 1987, PAGE 221, WAKE COUNTY REGISTRY.

Parcel ID No.: 0780992304

5. The record title holder of 5200 Blue Stem Court is Parson Investment Group, Inc., a North Carolina corporation.

6. Based on the investigation described in this declaration, there is probable cause to believe that the Subject Property constitutes or is derived from proceeds traceable to specified unlawful activity, specifically Title 18, United States Code, Sections 1031 (major fraud against the United States), 1347 (health care fraud) and/or 1349 (conspiracy to commit health care fraud), or were involved in transactions or attempted transactions in violation of Title 18, United States Code, Section 1957 (collectively, the "Subject Offenses"), and are therefore subject to forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and (C).

7. This investigation concerns Andor Labs, LLC ("Andor"), a Georgia limited liability company with a principal office address at 1000 Bear Cat Way, Suite 107, Morrisville, North Carolina 27560, in the Eastern District of North Carolina. As will be shown below, there is probable cause to believe that Andor, in concert with others, fraudulently billed the Health Resources & Services Administration ("HRSA") Uninsured Program (the "Uninsured Program") for beneficiaries that were not uninsured.

## Jurisdiction

8. This Court has *in rem* jurisdiction over the Subject Property pursuant to 28 U.S.C. § 1355(b) because the Subject Property is located in the Eastern District of North Carolina and because one or more acts or omissions giving rise to the forfeiture occurred in the Eastern District of North Carolina. As described in the paragraphs below, the Subject Offenses at issue have occurred, among other places, in the Eastern District of North Carolina.

## Regulatory Background

9. In response to the public health emergency caused by the global COVID-19 pandemic, Congress enacted various legislation to ensure that persons in the United States could receive COVID-19 testing at no cost to themselves.

10. Congress passed the Families First Coronavirus Response Act ("FFCRA") on March 18, 2020, which appropriated $1 billion to the Public Health and Social

Services Emergency Fund to reimburse health care providers for COVID-19 testing claims of "uninsured individuals" who were not enrolled in a federal health care program or a "group health plan or other health insurance coverage offered by a health insurance issuer .. . or a health plan offered under chapter 89 of title 5, United States Code." Pub. L. No. 116-127, 134 Stat. 182 (2020).

11. On March 27, 2020, Congress passed the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), which appropriated $100 billion to the Public Health and Social Services Emergency Fund for health care providers "for health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. No. 116-136, 134 Stat. 281 (2020). HHS created the Provider Relief Fund ("PRF") using these funds.

12. Additional amounts were appropriated through the Paycheck Protection Program and Health Care Enhancement Act ("PPPHCEA"), Pub. L. No. 116-139, 134 Stat. 620 (2020), and the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 40.

13. The Secretary of HHS allocated a portion of funding from the CARES Act, PPPHCEA, and ARPA to support health care-related expenses attributable to COVID-19 testing for the uninsured and treatment of uninsured individuals with COVID-19, as well as to reimburse providers for administering Food and Drug Administration ("FDA")-authorized or -licensed COVID-19 vaccines to uninsured individuals pursuant to the Uninsured Program.

14. HRSA, an agency within HHS, established and administered the Uninsured Program. In order to protect the integrity of the program, HRSA mandated that any providers seeking reimbursement from the Uninsured Program agree to specific terms and conditions, and make attestations regarding their compliance with specific program requirements.

15. The submission of claims to the Uninsured Program involved several steps. First, through an online portal known as the "UIP Portal," health care providers had to enroll in the Uninsured Program. Through the UIP Portal, health care providers were also required to submit a "patient roster." Patient rosters contained identifying information regarding the providers' uninsured patients. In order to upload any patient roster to the UIP Portal, however, the provider had to first make attestations to HRSA regarding these patients (the "Patient Roster Attestations"). The Patient Roster Attestations consisted of "boxes" that providers had to "check" in order to upload a patient roster.

16. True and correct "screenshots" of the Patient Roster Attestations used during the lifetime of the Uninsured Program are attached as Exhibit A.

17. As set forth in Exhibit A, the Patient Roster Attestations included a representation from the provider that they had "checked for health care coverage eligibility and confirmed that the patient is uninsured and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient."

18. Further, in the Patient Roster Attestations, the providers had to attest that they had read and agreed to the Uninsured Program's terms and conditions. The Terms and Conditions (which were linked in the Patient Roster Attestations and available on the Uninsured Program's website) specifically prohibited providers from seeking reimbursement for COVID-19 testing that: (1) had been provided to patients that had any health care coverage; or (2) would be (or had been) reimbursed by another payer. *See* First Uninsured Program Terms and Conditions, *available at* https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-ffcra-relieffund.pdf (attached as Exhibit B) (hereinafter "First Terms and Conditions"); Updated Uninsured Program Terms and Conditions, *available at* https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-uninsured-relieffund.pdf (attached as Exhibit C) (hereinafter "Updated Terms and Conditions") (collectively, the "Terms and Conditions").

19. Specifically, until on or about May 31, 2021, the First Terms and Conditions provided in relevant part that: "[the provider] ... certifies that to the best of its knowledge, the patients identified on the claim form were FFCRA Uninsured Individuals at the time the services were provided . . ." "FFCRA Uninsured Individuals" were defined as individuals who, as of the date they received the service for which the provider sought payment, were not enrolled in a private health insurance plan or a federal health care program. *See* Exhibit B. In addition, the First Terms and Conditions provided that the "[The provider] certifies that it will not use the [Uninsured Program payment] to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse. If the [provider] subsequently receives reimbursement for any items or services for which the [provider] requested Payment from the [Uninsured Program], the [provider] will return to HHS that portion of the Payment which duplicates payment or reimbursement from another source." *Id.*

20. On or about May 31, 2021, HRSA updated the language of its Terms and Conditions, but did not change any of the aforementioned requirements.[1] The

---

[1] In addition, HRSA updated the Patient Roster Attestations on June 18, 2021, and December 17, 2021, but did not modify the attestations relating to checking for health care coverage

Updated Terms and Conditions provided that: "The [Provider] . . . certifies that to the best of its knowledge, the patients identified on the claim form were Uninsured Individuals at the time the services were provided." "Uninsured Individuals" were defined as "individuals who do not have any health care coverage at the time the services were provided." *See* Exhibit C. Further, the Updated Terms and Conditions' language regarding payments from other sources remained the same as in the First Terms and Conditions.

21. Through their agreement to the Terms and Conditions, providers also acknowledged that their obligations were ongoing, as well as to the materiality of their compliance. *See id.* ("The Recipient acknowledges that each time the Recipient submits such claims for reimbursement, each claim must be in full compliance with these Terms and Conditions, and submission of those claims confirms the Recipient's ongoing compliance with these Terms and Conditions. The Recipient acknowledges that the Recipient's full compliance with all Terms and Conditions is material to the Secretary's decision to disburse funds to the Recipient. Noncompliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made.")

22. Claims submissions to the Uninsured Program were made through the Medicare Electronic Data Interchange ("MEDI"), a system widely used by health care providers.

23. The Uninsured Program generally reimbursed providers at rates published by the Centers for Medicare and Medicaid Services ("CMS"), which published Healthcare Common Procedure Coding System ("HCPCS") codes that were used in providers' electronic claims submissions to the Uninsured Program. Through these HCPCS codes, the providers identified the specific services rendered. The Uninsured Program reimbursed providers as much as $100 for providing a COVID-19 test, and an additional $23.46 for the collection of a specimen.

24. HRSA also provided ongoing guidance to providers. For example, HRSA published "Frequently Asked Questions" ("FAQs") and corresponding answers on the Uninsured Program's website. Those answers consistently stated that a patient is considered uninsured only if the patient did not have health care coverage at the time services were rendered. It also made clear that if a claim was submitted to HRSA for a patient that was determined to be insured, the provider should receive a notice that the claim was ineligible for reimbursement:

---

eligibility. *See* Exhibit A. All versions of the Patient Roster Attestations likewise still required providers to agree to the Uninsured Program Terms and Conditions. *See id.*

> *Who is considered to be an "uninsured individual" for purposes of providers requesting reimbursement for testing, treatment, or vaccine administration?*
>
> For claims for COVID-19 testing and testing-related items and services, treatment of positive cases of COVID-19, and vaccine administration claims, a patient is considered uninsured if the patient did not have any health care coverage at the time services were rendered.
>
> *What if a provider submitted a claim to the HRSA COVID-19 Uninsured Program and the patient is actually underinsured?*
>
> If a claim was submitted to the HRSA COVID-19 Uninsured Program for a patient who was actually insured, the provider should receive a notice that the claim was not eligible for reimbursement.

HRSA, FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs (published June 2021), *available at* https://coviduninsuredclaim-stage.linkhealth.com/frequently-asked-questions.html (attached as Exhibit D) (hereinafter "FAQs").

25. Further, the Uninsured Program's website informed providers, that if they make direct contact with the patients, the provider should make their own "best efforts to confirm that the patient was uninsured." HRSA, Uninsured Program Patient Roster Attestation Webpage, archived version available at https://coviduninsuredclaim-stage.linkhealth.com/patient-details.html (Attached as Exhibit E).

26. To facilitate HRSA's ability to determine whether a patient was indeed uninsured, Uninsured Program guidance published by HRSA informed providers that they should submit a patient's "SSN and state of residence" with their claims or, "if not available," the patient's state identification or driver's license. *See* FAQs. The guidance explained that this information was "needed only for the purpose of verifying insurance status." *Id.* If a provider could not obtain that information, they were required "to attest that [they] attempted to capture this information before submitting a claim." *Id.*

27. The Uninsured Program could only reimburse providers using the funds that had been appropriated by Congress. On March 16, 2022, HRSA informed providers that, on March 22, 2022, the Uninsured Program would stop accepting new claims for COVID-19 testing and treatment due to a lack of sufficient appropriated funds.

28. HRSA's payment decisions turned on, among other things, whether a provider complied with its obligations to submit claims for reimbursement only when: (1) no other payer would reimburse (or had reimbursed) the COVID-19 testing; and (2) the provider had confirmed that the patient was an uninsured individual.

29. If HRSA had known that a provider had submitted claims for COVID-19 testing where either another payer would reimburse (or had reimbursed) the provider for the COVID-19 testing or the patient had any health care coverage on the relevant date of service, HRSA would have not paid the claims.

### HRSA Uninsured Program Fraud

30. As detailed below, there is probable cause to believe that Andor fraudulently submitted claims to the HRSA Uninsured Program for patients Andor knew were insured through a federal healthcare program or private insurance.

31. A review of federal healthcare program data revealed that between 2020 and the present, Andor was paid tens of millions of dollars by federal healthcare programs for laboratory services, including payments by Medicare Part B and the HRSA Uninsured Program for COVID-19 testing and related services. In particular, between January 1, 2020, and September 13, 2025, Medicare Part B paid Andor more than $15 million, and for dates of service between July 16, 2020, and March 21, 2022, the Uninsured Program paid Andor more than $10 million.

32. Investigators have conducted a preliminary analysis of claims submitted by Andor to the Uninsured Program and Medicare and Medicaid. The preliminary analysis identified numerous patients on whose behalf Andor submitted a claim to Medicare or Medicaid just weeks before submitting a claim for the same patient to the Uninsured Program, including the following examples:

   a. **W.B.** - Andor submitted claims to Medicare related to COVID-19 testing for patient W.B. for services conducted on December 17, 2020, and continued submitting claims to Medicare for COVID-19 testing conducted through August 17, 2021. Andor submitted claims to the Uninsured Program related to COVID-19 testing for patient W.B. conducted on December 17, 2020, and continued submitting claims to the Uninsured Program for COVID-19 testing conducted through September 3, 2021. The service dates for many of the COVID-19 tests billed to Medicare and the Uninsured Program during that time period are identical.

b. **B.C.** - Andor submitted claims to Medicare related to COVID-19 testing for patient B.C. for services conducted on January 5, 2021, and continued submitting claims to Medicare for COVID-19 testing conducted through August 24, 2021. Andor submitted claims to the Uninsured Program related to COVID-19 testing for patient B.C. conducted on January 5, 2021, and continued submitting claims to the Uninsured Program for COVID-19 testing conducted through September 3, 2021. The service dates for many of the COVID-19 tests billed to Medicare and the Uninsured Program during that time period are identical.

c. **O.C.** - Andor submitted claims to Medicare related to COVID-19 testing for patient O.C. for services conducted on February 1, 2021, and continued submitting claims to Medicare for COVID-19 testing conducted through May 15, 2023. Andor submitted claims to the Uninsured Program related to COVID-19 testing for patient O.C. conducted on March 1, 2021, and continued submitting claims to the Uninsured Program for COVID-19 testing conducted through June 28, 2021.

d. **M.E.** - Andor submitted claims to Medicare related to COVID-19 testing for patient M.E. for services conducted on December 7, 2020, and continued submitting claims to Medicare for COVID-19 testing conducted through July 25, 2022. Andor submitted claims to the Uninsured Program related to COVID-19 testing for patient M.E. conducted on September 20, 2021, and continued submitting claims to the Uninsured Program for COVID-19 testing conducted through January 27, 2022. Many of the claims submitted to the Uninsured Program were for dates of service less than two weeks after a date of service for which Andor submitted a claim to Medicare for M.E.

e. **J.G.** - Andor submitted claims to Medicare related to COVID-19 testing for patient J.G. for services conducted on May 5, 2021, and continued submitting claims to Medicare for COVID-19 testing conducted through September 23, 2021. Andor submitted claims to the Uninsured Program related to COVID-19 testing for patient J.G. conducted on June 2, 2021, and continued submitting claims to the Uninsured Program for COVID-19 testing conducted through June 16, 2021.

f. **B.H.** - Andor submitted claims to Medicare related to COVID-19 testing for patient B.H. for services conducted on December 7, 2020, and continued submitting claims to Medicare for COVID-19 testing conducted through July 25, 2022. Andor submitted claims to the

Uninsured Program related to COVID-19 testing for patient B.H. conducted on August 9, 2021, and continued submitting claims to the Uninsured Program for COVID-19 testing conducted through February 21, 2022.

g. **E.T.** - Andor submitted claims to Medicare related to COVID-19 testing for patient E.T. for services conducted on November 3, 2020, and continued submitting claims to Medicare for COVID-19 testing conducted through January 18, 2021. Andor submitted a claim to the Uninsured Program related to COVID-19 testing for patient E.T. conducted on December 7, 2020.

h. **R.Y.** - Andor submitted claims to Medicare related to COVID-19 testing for patient R.Y. for services conducted on December 14, 2020, and continued submitting claims to Medicare for COVID-19 testing conducted through July 25, 2022. Andor submitted claims to the Uninsured Program related to COVID-19 testing for patient R.Y. conducted on May 17, 2021, and continued submitting claims to the Uninsured Program for COVID-19 testing conducted through August 30, 2021. A few of the claims submitted to the Uninsured Program were for dates of service less than two weeks after a date of service for which Andor submitted a claim to Medicare for R.Y.

33. A preliminary analysis of the full universe of claims submitted by Andor to the Uninsured Program revealed that, notwithstanding HRSA instruction that claimants should provide a Social Security or State ID number with all claims, Andor did not submit a Social Security Number or State ID number for approximately eighty-five percent (85%) of 132,144 claims it submitted to the Uninsured Program.

34. A preliminary analysis of the full universe of claims submitted by Andor to the Uninsured Program revealed that the full name, date of birth, gender, and state listed on more than 40,000 claims matched to a Medicare or Medicaid beneficiary. The Uninsured Program paid Andor more than $5,000,000 for COVID-19 testing related services for those claims. And more than 10,000 additional claims submitted by Andor to the Uninsured Program were for patients that matched or potentially matched to Medicare or Medicaid beneficiaries using other matching criteria. In total, the preliminary analysis found that more than a third of claims submitted by Andor to the Uninsured Program were for patients that matched or potentially matched to government insurance programs (*i.e.* Medicare or Medicaid).

35. An analysis of records indicates that other claims submitted by Andor were for patients with private insurance.

36. Internal Andor billing records obtained by investigators for 18 patients confirmed that Andor billed to—and was paid by—the Uninsured Program for COVID-19 testing conducted on dates of services that were just days after dates of services for COVID-19 testing that Andor billed to—and was paid by—Medicare, Medicaid, or a private insurer for the same patient. For those 18 patients alone, Andor billed the Uninsured Program more than $20,000 dollars for COVID-19 testing services.

37. Andor's 2025 Limited Liability Company Annual Report submitted to the North Carolina Secretary of State lists Syed Iqbal Haider and Gulamnabi Vahora as "Managing Member[s]" of Andor, and Sarah Al-Baghdadi as "Member" of Andor.

38. According to court records, Sarah Al-Baghdadi was married to Murad Ayyad ("Ayyad") from August 3, 2011, until a Judgment of Divorce was entered on November 8, 2024.

39. A confidential source ("CS-1"), who worked for Andor from early 2020 to early 2022, said that Andor performed COVID-19 tests for samples collected at drive-thru testing sites. CS-1 further said Andor was busy during COVID-19 and then its business slowed down.

40. A second confidential source ("CS-2") worked at Andor from early 2021 through late 2022. CS-2 said s/he understood Ayyad to be the owner of Andor, and that Ayyad was responsible for Andor's day-to-day operations.

41. A third confidential source ("CS-3") said that Andor provided COVID-19 testing, both PCR and antigen, for patients housed in a senior living community. CS-3 said that Andor also performed COVID-19 tests at medical practices. CS-3 said that many of the COVID-19 tests used by Andor for patients of those practices were expired.

42. A fourth confidential source ("CS-4") said that Ayyad lived in the Subject Property through the fall of 2024.

43. In a 2025 annual report submitted to the North Carolina Secretary of State, Ayyad is listed as the President and Registered Agent of Lab Services Associates Inc. ("LSA"), a North Carolina corporation. LSA's principal office address is listed as 4801 East Independence Boulevard, Suite 502, Charlotte, NC 28212.

**Conducting Transactions in Criminally Derived Property**

44. There is also probable cause to believe that in addition to the commission of the fraud described above, Andor and others engaged in monetary transactions in excess of $10,000, using funds derived from the Uninsured Program fraud, a violation of Title 18, United States Code, Section 1957.

45. Investigators obtained bank records for Andor and LSA. Based on federal health care program enrollment records and a review of those bank records, the proceeds of the aforementioned HRSA Uninsured Program fraud were deposited into a bank account owned by Andor and controlled by Andor's Managing Members. This account is identified as BB&T Business Value 500 Checking account ending 0667 ("BB&T 0667").

46. Andor bank records for the above referenced account revealed that between September 2020 and July 2023, Andor paid more than $15 million, in aggregate, to bank accounts owned by LSA and controlled by Ayyad. These accounts are identified as Wells Fargo Initiate Business Checking account ending 5404 ("WF 5404") and JPMorgan Chase Bank Chase Platinum Business Checking account ending 3269. Checks and wires paid by Andor to LSA described the payments as, among other descriptions, for "manage/consultant," "mgmt. services," "lab services," "Management Services," "Lab Management Services," and "Sales Management Fees."

47. Generally accepted tracing methods approved by the Fourth Circuit were applied to the aforementioned bank accounts to maintain a clear distinction between the HRSA Uninsured Program proceeds and non-HRSA Uninsured Program proceeds. Well-established tracing methods were used to follow the movement of HRSA Uninsurance Program proceeds through Andor's BB&T 0667 into LSA's WF 5404 and ultimately to fund the purchase of the Subject Property.

48. Between September 14, 2020 and April 23, 2021, over $1.6 million of HRSA Uninsured Program proceeds were deposited into Andor's BB&T 0667. During this same period of time, more than $500,000 was paid from Andor's BB&T 0667 to LSA's WF 5404, via seven transactions. These seven transactions contained, in aggregate, over $350,000 of HRSA Uninsured Program proceeds, and five of the transactions contained more than $10,000 in HRSA Uninsured Program proceeds.

49. Real estate records establish that LSA purchased the Subject Property on May 28, 2021, from Deutsche Bank National Trust Company as Trustee.

50. In connection with the closing, LSA wired a total of $828,478.71 from LSA's WF 5404 to Brady and Kosofsky, the closing attorneys for the Subject Property,

in two separate wires that each individually contained more than $10,000 of HRSA Uninsured Program proceeds:

    a. On May 4, 2021, LSA wired $15,000 from Wells Fargo account ending 5404 to Brady and Kosofsky PA for "earnest money 5200 Blue Stem Ct, Raleigh, NC".

    b. On May 27, 2021, LSA wired $813,478.71 from Wells Fargo account ending 5404 to Brady and Kosofsky for "closing RE. 5200 Blue Stem, Raleigh, NC 27606".

51. Bank records showed that, in October 2021, LSA issued a printed check for $1 million with a handwritten memo "real estate investment loan" to Parson Investment Group, Inc. ("Parson"), another entity which investigators have learned is associated with Ayyad. Like LSA, the principal office address for Parson is 4801 East Independence Boulevard, Suite 502, Charlotte, NC 28212. Bank records further show that LSA made a $200,000 capital contribution to Parson in January 2023.

52. In May 2024, after Andor learned that it was under investigation related to claims it submitted to the Uninsured Program, LSA transferred the Subject Property to Parson via non-warranty deed for no consideration.

53. The following chart demonstrates the chain of title for the Subject Property:



## Conclusion

54. Based on the foregoing, the Subject Property constitutes or is derived from proceeds traceable to specified unlawful activity, specifically Title 18, United States Code, Sections 1031 (major fraud against the United States), 1347 (health care fraud) and/or 1349 (conspiracy to commit health care fraud), or were involved in transactions or attempted transactions in violation of Title 18, United States Code, Section 1957 (collectively, the "Subject Offenses"), and are therefore subject to forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and (C).

Executed this 9th day of October, 2025.

BENNETT STRICKLAND
Civil Healthcare Fraud Investigator

# EXHIBIT A

**Patient Roster Attestation from Beginning of Uninsured Program to On Or About June 18, 2021**

### Patient Roster Attestation

☑ I have read and agree to the applicable HRSA COVID-19 Uninsured Program Terms and Conditions for Testing or Treatment Services. I attest that I am authorized to agree to these terms on behalf of the provider with the Tax Identification Number associated with this attestation.

☑ I attest that I have checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient.

☑ I agree that I will accept the defined program reimbursement, as determined and/or adjustment by Health Resources & Services Administration (HRSA), as payment in full and will not balance bill the patient. I further understand that reimbursement is subject to available funding for the program.

☑ I acknowledge that I may be asked to submit to the review process established by HRSA, including its contractor to determine whether payments were made correctly. Additionally, upon request by HRSA or its contractor, I will provide any and all information related to the disposition or use of the funds received under the HRSA COVID-19 Uninsured Program for auditing and/or reporting purposes.

[ Cancel ]  [ Submit ]

**Patient Roster Attestation from On or About June 18, 2021 to On or About December 17, 2021**

### Patient Roster Attestation

☑ I have read and agree to the applicable HRSA COVID-19 Uninsured Program Terms and Conditions (PDF). I attest that I am authorized to agree to these terms on behalf of the provider with the Tax Identification Number associated with this attestation.

☐ I attest that I have checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient.

☐ I agree that I will accept the defined program reimbursement, as determined and/or adjustment by Health Resources & Services Administration (HRSA), as payment in full and will not balance bill the patient. I further understand that reimbursement is subject to available funding for the program.

☐ I acknowledge that I may be asked to submit to the review process established by HRSA, including its contractor to determine whether payments were made correctly. Additionally, upon request by HRSA or its contractor, I will provide any and all information related to the disposition or use of the funds received under the HRSA COVID-19 Uninsured Program for auditing and/or reporting purposes.

[ Cancel ]  Submit

## Patient Roster Attestation from On or About December 17, 2021 Until the End of the Uninsured Program

**Patient Roster Attestation**

☐ I have read and agree to the applicable HRSA COVID-19 Uninsured Program Terms and Conditions (PDF). I attest that I am authorized to agree to these terms on behalf of the provider with the Tax Identification Number associated with this attestation

☐ I attest that I have checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient

☐ For vaccine administration claims, I attest that I have checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 vaccine administration for the patient, or their only health care coverage at the time the services were provided was foreign health coverage.

☐ I agree that I will accept the defined program reimbursement, as determined and/or adjustment by Health Resources & Services Administration (HRSA), as payment in full and will not balance bill the patient. I further understand that reimbursement is subject to available funding for the program

☐ I acknowledge that I may be asked to submit to the review process established by HRSA, including its contractor to determine whether payments were made correctly. Additionally, upon request by HRSA or its contractor, I will provide any and all information related to the disposition or use of the funds received under the HRSA COVID-19 Uninsured Program for auditing and/or reporting purposes

# EXHIBIT B

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

**Acceptance of Terms and Conditions**

I hereby attest to the following Terms and Conditions on behalf of the provider with the Tax Identification Number associated with this attestation ("Recipient"). I further attest that I am authorized to make such attestation on behalf of the Recipient. The Terms and Conditions below are not an exhaustive list and the Recipient agrees to comply with any other applicable statutes and regulations.

The Recipient plans to submit claims for reimbursement for COVID-19 Testing and/or Testing-Related Items and Services provided to FFCRA Uninsured Individuals (as those terms are further defined below). The Recipient acknowledges that each time the Recipient submits such claims for reimbursement, each claim must be in full compliance with these Terms and Conditions, and submission of those claims confirms the Recipient's ongoing compliance with these Terms and Conditions.

The Recipient acknowledges that the Recipient's full compliance with all Terms and Conditions is material to the Secretary's decision to disburse funds to the Recipient. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made.

These Terms and Conditions apply directly to the Recipient. In general, the requirements that apply to the Recipient also apply to subrecipients and contractors, unless an exception is specified.

<u>FFCRA Relief Fund Payment Terms and Conditions</u>

- The "Payment" means the funds received from the Public Health and Social Services Emergency Fund, as appropriated in Public Law 116-127 ("FFCRA Relief Fund") to provide "COVID-19 Testing" and "Testing-Related Items and Services" to "FFCRA Uninsured Individuals," as those terms are further defined below. The "Recipient" means the healthcare provider, whether an individual or an entity, receiving the Payment.
  - o COVID-19 Testing means:
    - An in vitro diagnostic test defined in section 809.3 of title 21, Code of Federal Regulations (or successor regulations) for the detection of SARS–CoV–2 or the diagnosis of the virus that causes COVID–19, and the administration of such a test, that—
      - Is approved, cleared, or authorized under section 510(k), 513, 515, or 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360(k), 360c, 360e, 360bbb–3);



- The developer has requested, or intends to request, emergency use authorization under section 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb–3), unless and until the emergency use authorization request under such section 564 has been denied or the developer of such test does not submit a request under such section within a reasonable timeframe;

- Is developed in and authorized by a State that has notified the Secretary of Health and Human Services of its intention to review tests intended to diagnose COVID-19; or

- Other test that the Secretary determines appropriate in guidance.

o Testing-Related Items and Services means items and services furnished to an individual during health care provider office visits (including in-person visits and telehealth visits), urgent care center visits, and emergency room visits that result in an order for or administration of COVID-19 Testing but only to the extent such items and services relate to the furnishing or administration of such product or to the evaluation of such individual for purposes of determining the need of such individual for such product.

o FFCRA Uninsured Individuals means individuals who, as of the date of service for which Recipient seeks Payment, are not enrolled in—

▪ A Federal health care program (as defined under section 1128B(f) of the Social Security Act (42 U.S.C. 1320a-7b(f)), including an individual who is eligible for medical assistance only because of subsection (a)(10)(A)(ii)(XXIII) of Section 1902 of the Social Security Act; or

▪ A group health plan or health insurance coverage offered by a health insurance issuer in the group or individual market (as such terms are defined in section 2791 of the Public Health Service Act (42 U.S.C. 300gg-91)), or a health plan offered under chapter 89 of title 5, United States Code.

- The Recipient certifies that it is not currently terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D; is not currently excluded from participation in Medicare, Medicaid, and other Federal health care programs; and does not currently have Medicare billing privileges revoked.

- The Recipient certifies that it, or its agents, provided the COVID-19 Testing and/or Testing-Related Items and Services on the Recipient's claim form to the FFCRA Uninsured Individuals identified on the claim form; that the dates of service occurred on February 4, 2020, or later; and that all items and services for which Payment is sought were medically necessary. The Recipient also certifies that to the best of its knowledge, the patients identified on the claim form were FFCRA Uninsured Individuals at the time the services were provided.



- The Recipient certifies that it will not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse. If the Recipient subsequently receives reimbursement for any items or services for which the Recipient requested Payment from the FFCRA Relief Fund, the Recipient will return to HHS that portion of the Payment which duplicates payment or reimbursement from another source. The Recipient will not include costs for which Payment was received in cost reports or otherwise seek uncompensated care reimbursement through federal or state programs for items or services for which Payment was received.

- The Recipient shall submit reports as the Secretary determines are needed to ensure compliance with conditions that are imposed on this Payment, including all relevant claims data, and such reports shall be in such form, with such content, as specified by the Secretary in future program instructions directed to all Recipients. The Recipient acknowledges and agrees that the Secretary will share relevant claims data with components of the Department of Health and Human Services.

- The Recipient consents to the Department of Health and Human Services publicly disclosing the Payment that Recipient may receive from the FFCRA Relief Fund.

- The Recipient certifies that all information it provides as part of its application for the Payment, as well as all information and reports relating to the Payment that it provides in the future at the request of the Secretary or Inspector General, are true, accurate and complete, to the best of its knowledge. The Recipient acknowledges that any deliberate omission, misrepresentation, or falsification of any information contained in a request for reimbursement or future report may be punishable by criminal, civil, or administrative penalties, including but not limited to revocation of Medicare billing privileges, exclusion from federal health care programs, and/or the imposition of fines, civil damages, and/or imprisonment.

- Not later than 10 days after the end of each calendar quarter, any Recipient that is an entity receiving more than $150,000 total in funds under the Coronavirus Aid, Relief, and Economic Security Act (P.L. 116-136), the Coronavirus Preparedness and Response Supplemental Appropriations Act (P.L. 116-123), the Families First Coronavirus Response Act (P.L. 116-127), or any other Act primarily making appropriations for the coronavirus response and related activities, shall submit to the Secretary and the Pandemic Response Accountability Committee a report. This report shall contain: the total amount of funds received from HHS under the foregoing enumerated Acts; the amount of funds received that were expended or obligated for each project or activity; a detailed list of all projects or activities for which the funds were expended or obligated, including: the name and description of the project or activity, and the estimated number of jobs created or retained by the project or activity, where applicable; and detailed information on any level of subcontracts or subgrants awarded by the Recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 allowing aggregate



reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

- The Recipient shall maintain appropriate records and documentation including, as applicable, documentation described in 45 CFR § 75.302 – Financial management and 45 CFR § 75.361 through 75.365 – Record Retention and Access, and other information required by future program instructions to substantiate Payments under this award. The Recipient shall promptly submit copies of such records and documentation upon the request of the Secretary, and Recipient agrees to fully cooperate in all audits the Secretary, Inspector General, or Pandemic Response Accountability Committee conducts to ensure compliance with these Terms and Conditions.

- The Recipient agrees that all claims it submits will be full and complete (i.e., no interim bills or corrected claims). The Recipient acknowledges that all payments are final and there will be no adjustments.

- The Secretary will reimburse the Recipient generally at 100 percent of Medicare rates (including any amounts that would have been due to the provider as patient cost sharing) for the COVID-19 Testing and/or Testing-Related Items and Services that Respondent provided to FFCRA Uninsured Individuals for which the Recipient submits claims to the FFCRA Relief Fund. If there is no Medicare standard rate, a calculated average rate will be used. Exclusions from coverage and alternatives to where Medicare rates do not apply are outlined in the program details.

- The Recipient certifies that it will not engage in "balance billing" or charge any type of cost sharing for any COVID-19 Testing and/or Testing-Related Items and Services provided to FFCRA Uninsured Individuals for which the Recipient receives a Payment from the FFCRA Relief Fund. The Recipient shall consider Payment received from the FFCRA Relief Fund to be payment in full for such care or treatment.

- If the Recipient, prior to signing these Terms and Conditions, charged any FFCRA Uninsured Individuals a fee for COVID-19 Testing and/or Testing-Related Items and Services for which the Recipient subsequently received a Payment from the FFCRA Relief Fund, the Recipient will communicate to the FFCRA Uninsured Individuals that they do not owe Recipient any money for that care or treatment. If an FFCRA Uninsured Individual paid the Recipient for any portion of such care or treatment, the Recipient will timely return the payment to the FFCRA Uninsured Individual.

The following statutory provisions also apply:

**General Provisions in FY 2020 Consolidated Appropriation**

**SEC. 202. Executive Pay.** None of the funds appropriated in this title shall be used to pay the salary of an individual, through a grant or other extramural mechanism, at a rate in excess of Executive Level II:

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

**SEC. 210. Funding Prohibition for Gun Control Advocacy**. None of the funds made available in this title may be used, in whole or in part, to advocate or promote gun control.

**SEC. 503. Lobbying**

(a) No part of any appropriation contained in this Act or transferred pursuant to section 4002 of Public Law 111–148 shall be used, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, for the preparation, distribution, or use of any kit, pamphlet, booklet, publication, electronic communication, radio, television, or video presentation designed to support or defeat the enactment of legislation before the Congress or any State or local legislature or legislative body, except in presentation to the Congress or any State or local legislature itself, or designed to support or defeat any proposed or pending regulation, administrative action, or order issued by the executive branch of any State or local government, except in presentation to the executive branch of any State or local government itself.

(b) No part of any appropriation contained in this Act or transferred pursuant to section 4002 of Public Law 111–148 shall be used to pay the salary or expenses of any grant or contract recipient, or agent acting for such recipient, related to any activity designed to influence the enactment of legislation, appropriations, regulation, administrative action, or Executive order proposed or pending before the Congress or any State government, State legislature or local legislature or legislative body, other than for normal and recognized executive-legislative relationships or participation by an agency or officer of a State, local or tribal government in policymaking and administrative processes within the executive branch of that government.

(c) The prohibitions in subsections (a) and (b) shall include any activity to advocate or promote any proposed, pending or future Federal, State or local tax increase, or any proposed, pending, or future requirement or restriction on any legal consumer product, including its sale or marketing, including but not limited to the advocacy or promotion of gun control.

**SEC. 506. Prohibits Use of Federal Funds for Abortions.**

(a) None of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for any abortion.

(b) None of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for health benefits coverage that includes coverage of abortion.

(c) The term ''health benefits coverage'' means the package of services covered by a managed care provider or organization pursuant to a contract or other arrangement.

none
none

none
none
none
none
none
none
none
none
none
none
none
none
none





### SEC. 507 Limitations on Abortion Funding Prohibition

(a) The limitations established in the preceding section shall not apply to an abortion—

(1) if the pregnancy is the result of an act of rape or incest; or

(2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.

(b) Nothing in the preceding section shall be construed as prohibiting the expenditure by a State, locality, entity, or private person of State, local, or private funds (other than a State's or locality's contribution of Medicaid matching funds).

(c) Nothing in the preceding section shall be construed as restricting the ability of any managed care provider from offering abortion coverage or the ability of a State or locality to contract separately with such a provider for such coverage with State funds (other than a State's or locality's contribution of Medicaid matching funds).

(d)(1) None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.

(2) In this subsection, the term ''health care entity'' includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan.

### SEC. 508. Prohibits Use of Funds for Embryo Research

(a) None of the funds made available in this Act may be used for—

(1) the creation of a human embryo or embryos for research purposes; or

(2) research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 CFR 46.204(b) and section 498(b) of the Public Health Service Act (42 U.S.C. 289g(b)).

(b) For purposes of this section, the term ''human embryo or embryos'' includes any organism, not protected as a human subject under 45 CFR 46 as of the date of the enactment of this Act,



that is derived by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes or human diploid cells.

**SEC. 509. Prohibits Promotion of Legalization of Controlled Substances**

(a) None of the funds made available in this Act may be used for any activity that promotes the legalization of any drug or other substance included in schedule I of the schedules of controlled substances established by section 202 of the Controlled Substances Act except for normal and recognized executive-congressional communications.

(b) The limitation in subsection (a) shall not apply when there is significant medical evidence of a therapeutic advantage to the use of such drug or other substance or that federally sponsored clinical trials are being conducted to determine therapeutic advantage.

**SEC. 515. (b) Prohibits Asking Candidates for Federal Scientific Advisory Committees Their Political Affiliations; Prohibits Distribution of Intentionally False Information**

(b) None of the funds made available in this Act may be used to disseminate information that is deliberately false or misleading.

**SEC. 520. Pornography.**

(a) None of the funds made available in this Act may be used to maintain or establish a computer network unless such network blocks the viewing, downloading, and exchanging of pornography.

(b) Nothing in subsection (a) shall limit the use of funds necessary for any Federal, State, tribal, or local law enforcement agency or any other entity carrying out criminal investigations, prosecution, or adjudication activities.

**SEC. 521. Prohibits Funding ACORN or Its Affiliates or Subsidiaries.** None of the funds made available under this or any other Act, or any prior Appropriations Act, may be provided to the Association of Community Organizations for Reform Now (ACORN), or any of its affiliates, subsidiaries, allied organizations, or successors.

**SEC. 527. Prohibits Federal Funding for Needle Exchange Except in Limited Circumstances.** Notwithstanding any other provision of this Act, no funds appropriated in this Act shall be used to purchase sterile needles or syringes for the hypodermic injection of any illegal drug: *Provided*, That such limitation does not apply to the use of funds for elements of a program other than making such purchases if the relevant State or local health department, in consultation with the Centers for Disease Control and Prevention, determines that the State or local jurisdiction, as applicable, is experiencing, or is at risk for, a significant increase in

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

hepatitis infections or an HIV outbreak due to injection drug use, and such program is operating in accordance with State and local law.

**Government-wide General Provisions**

**SEC. 718. Propaganda.** No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.

**SEC. 732. Privacy Act.** None of the funds made available in this Act may be used in contravention of section 552a of title 5, United States Code (popularly known as the Privacy Act), and regulations implementing that section.

**SEC. 742. Confidentiality Agreements**.

(a) None of the funds appropriated or otherwise made available by this or any other Act may be available for a contract, grant, or cooperative agreement with an entity that requires employees or contractors of such entity seeking to report fraud, waste, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contactors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(b) The limitation in subsection (a) shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

**SEC. 743. Nondisclosure Agreements**

(a) No funds appropriated in this or any other Act may be used to implement or enforce the agreements in Standard Forms 312 and 4414 of the Government or any other nondisclosure policy, form, or agreement if such policy, form, or agreement does not contain the following provisions: "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this SEC. 743. (a) No funds appropriated in this or any other Act may be used to implement or enforce the agreements in Standard Forms 312 and 4414 of the Government or any other nondisclosure policy, form, or agreement if such



policy, form, or agreement does not contain the following provisions: "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.": *Provided*, That notwithstanding the preceding provision of this section, a nondisclosure policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure forms shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

(b) A nondisclosure agreement may continue to be implemented and enforced notwithstanding subsection (a) if it complies with the requirements for such agreement that were in effect when the agreement was entered into.

(c) No funds appropriated in this or any other Act may be used to implement or enforce any agreement entered into during fiscal year 2014 which does not contain substantially similar language to that required in subsection (a).

**SEC. 744. Unpaid Federal Tax Liability**. None of the funds made available by this or any other Act may be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and has made a determination that this further action is not necessary to protect the interests of the Government.

**SEC. 745. Criminal Felony Limitation.** None of the funds made available by this or any other Act may be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that was

DEPARTMENT OF HEALTH & HUMAN SERVICES

convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and has made a determination that this further action is not necessary to protect the interests of the Government.

## Other Appropriations Provisions

**42 U.S.C. 289d note** No funds appropriated under this Act or subsequent Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Acts shall be used by the National Institutes of Health, or any other Federal agency, or recipient of Federal funds on any project that entails the capture or procurement of chimpanzees obtained from the wild. For purposes of this section, the term 'recipient of Federal funds' includes private citizens, corporations, or other research institutions located outside of the United States that are recipients of Federal funds.

## Other Statutory Provisions

### Trafficking in Persons
This award is subject to the requirements of Section 106(g) of the Trafficking Victims Protection Act of 2000, as amended (22 U.S.C. 7104)

#### a. Provisions applicable to a recipient that is a private entity.
1. You as the recipient, your employees, subrecipients under this award, and subrecipients' employees may not
i.      Engage in severe forms of trafficking in persons during the period of time that the award is in effect;
ii.     Procure a commercial sex act during the period of time that the award is in effect; or
iii.    Use forced labor in the performance of the award or subawards under the award.
2. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if you or a subrecipient that is a private entity –
i. Is determined to have violated a prohibition in paragraph a.1 of this award term; or
ii. Has an employee who is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph a.1 of this award term through conduct that is either-
A. Associated with performance under this award; or
B. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 376.

#### b. Provision applicable to a recipient other than a private entity.
We as the Federal awarding agency may unilaterally terminate this award, without penalty, if a subrecipient that is a private entity-
1. Is determined to have violated an applicable prohibition in paragraph a.1 of this award term; or

Case 5:25-cv-00642-D    Document 1-2    Filed 10/09/25    Page 27 of 58

2. Has an employee who is determined by the agency official authorized to terminate the award to have violated an applicable prohibition in paragraph a.1 of this award term through conduct that is either

i. Associated with performance under this award; or

ii. Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 376

*c. Provisions applicable to any recipient.*
1. You must inform us immediately of any information you receive from any source alleging a violation of a prohibition in paragraph a.1 of this award term
2. Our right to terminate unilaterally that is described in paragraph a.2 or b of this section:
i. Implements section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended

(22 U.S.C. 7104(g)), and

ii. Is in addition to all other remedies for noncompliance that are available to us under this award.
3. You must include the requirements of paragraph a.1 of this award term in any subaward you make
to a private entity.

*d. Definitions.* For purposes of this award term:
1. "Employee" means either:
i. An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or
ii. Another person engaged in the performance of the project or program under this award and not compensated by you including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing or matching requirements.
2. "Forced labor" means labor obtained by any of the following methods: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.
3. "Private entity":
i. Means any entity other than a State, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR 175.25.
ii. Includes:
A. A nonprofit organization, including any nonprofit institution of higher education, hospital, or tribal organization other than one included in the definition of Indian tribe at 2 CFR 175.25(b).
B A for-profit organization.
4. "Severe forms of trafficking in persons," "commercial sex act," and "coercion" have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102)

**Whistleblower Protections**

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

You are hereby given notice that the 48 CFR section 3.908, implementing section 828, entitled "Pilot
Program for Enhancement of Contractor Employee Whistleblower protections," of the National
Defense Authorization Act (NDAA) for Fiscal Year (FY) 2013 (Pub. L. 112-239, enacted January 2,
2013) applies to this award.

**Human Subjects Protections**
If any activities under this project will involve human subjects in any research activities, you
must provide satisfactory assurance of compliance with the participant protection requirement of
the HHS/OASH Office of Human Research Protection (OHRP) prior to implementation of those
research components. This assurance should be submitted to the OHRP in accordance with the
appropriate regulations.

**Fraud, Abuse and Waste**:
The HHS Inspector General accepts tips and complaints from all sources about potential fraud,
waste, abuse, and mismanagement in Department of Health and Human Services' programs.
Your information will be reviewed promptly by a professional staff member. Due to the high
volume of information that they receive, they are unable to reply to submissions. You may reach
the OIG through various channels.
Internet: https://forms.oig.hhs.gov/hotlineoperations/index.aspx
Phone: 1-800-HHS-TIPS (1-800-447-8477)
Mail: US Department of Health and Human Services
Office of Inspector General
ATTN: OIG HOTLINE OPERATIONS
PO Box 23489
Washington, DC 20026
For additional information visit https://oig.hhs.gov/fraud/report-fraud/index.asp

# EXHIBIT C

**Acceptance of Terms and Conditions**

I hereby attest to the following Terms and Conditions on behalf of the provider with the Tax Identification Number associated with this attestation ("Recipient"). I further attest that I am authorized to make such attestation on behalf of the Recipient. The Terms and Conditions below are not an exhaustive list and the Recipient agrees to comply with any other applicable statutes and regulations.

The Recipient plans to submit claims for reimbursement for care or treatment related to: 1) positive diagnoses of COVID-19 where COVID-19 is the primary reason for treatment or 2) administering COVID-19 vaccinations provided to individuals who do not have any health care coverage at the time the services were provided. The Recipient acknowledges that each time the Recipient submits such claims for reimbursement, each claim must be in full compliance with these Terms and Conditions, and submission of those claims confirms the Recipient's ongoing compliance with these Terms and Conditions.

The Recipient acknowledges that the Recipient's full compliance with all Terms and Conditions is material to the Secretary's decision to disburse funds to the Recipient. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made.

These Terms and Conditions apply directly to the Recipient. In general, the requirements that apply to the Recipient also apply to subrecipients and contractors, unless an exception is specified.

Uninsured Relief Fund Payment Terms and Conditions

- The "Payment" means the funds received from the Public Health and Social Services Emergency Fund, as appropriated in Public Law 116-136 and Public Law 116-139 ("Relief Fund") to administer COVID-19 vaccinations or provide care or treatment related to positive diagnoses of COVID-19 for individuals who do not have any health care coverage at the time the services were provided ("Uninsured Individuals"). The "Recipient" means the healthcare provider, whether an individual or an entity, receiving the Payment.

- The Recipient certifies that it is not currently terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D; is not currently excluded from participation in Medicare, Medicaid, and other Federal health care programs; and does not currently have Medicare billing privileges revoked.

- The Recipient certifies that it, or its agents, provided the items and services on the Recipient's claim form to the Uninsured Individuals identified on the claim form; that the dates of service (or admittance if applicable) occurred on February 4, 2020, or later; and that all items and services for which Payment is sought were medically necessary as a preventive vaccination for COVID-19, or for care or treatment of COVID-19 and/or its complications. The Recipient also certifies that to the best of its knowledge, the patients identified on the claim form were Uninsured Individuals at the time the services were provided.

- The Recipient certifies that it will not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse. If the Recipient subsequently receives reimbursement for any items or services for which the Recipient requested Payment from the Relief Fund, the Recipient will return to HHS that portion of the Payment which duplicates payment or reimbursement from another source. The Recipient will not include costs for which Payment was received in cost reports or otherwise seek uncompensated care reimbursement through federal or state programs for items or services for which Payment was received.

- The Recipient shall submit reports as the Secretary determines are needed to ensure compliance with conditions that are imposed on this Payment, including all relevant claims data, and such reports shall be in such form, with such content, as specified by the Secretary in future program instructions directed to all Recipients. The Recipient acknowledges and agrees that the Secretary will share relevant claims data with components of the Department of Health and Human Services.

- The Recipient consents to the Department of Health and Human Services publicly disclosing the Payment that Recipient may receive from the Relief Fund.

- The Recipient certifies that all information it provides as part of its application for the Payment, as well as all information and reports relating to the Payment that it provides in the future at the request of the Secretary or Inspector General, are true, accurate and complete, to the best of its knowledge. The Recipient acknowledges that any deliberate omission, misrepresentation, or falsification of any information contained in a request for reimbursement or future report may be punishable by criminal, civil, or administrative penalties, including but not limited to revocation of Medicare billing privileges, exclusion from federal health care programs, and/or the imposition of fines, civil damages, and/or imprisonment.

- Not later than 10 days after the end of each calendar quarter, any Recipient that is an entity receiving more than $150,000 total in funds under the Coronavirus Aid, Relief, and Economic Security Act (P.L. 116-136), the Coronavirus Preparedness and Response Supplemental Appropriations Act (P.L. 116-123), the Families First Coronavirus Response Act (P.L. 116-127), or any other Act primarily making appropriations for the coronavirus response and related activities, shall submit to the Secretary and the Pandemic Response Accountability Committee a report. This report shall contain: the total amount of funds received from HHS under the foregoing enumerated Acts; the amount of funds received that were expended or obligated for each project or activity; a detailed list of all projects or activities for which the funds were expended or obligated, including: the name and description of the project or activity, and the estimated number of jobs created or retained by the project or activity, where applicable; and detailed information on any level of subcontracts or subgrants awarded by the Recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

- The Recipient shall maintain appropriate records and documentation including, as applicable, documentation described in 45 CFR § 75.302 – Financial management and 45 CFR § 75.361 through 75.365 – Record Retention and Access, and other information required by future program instructions to substantiate Payments under this award. The Recipient shall promptly submit copies of such records and documentation upon the request of the Secretary, and Recipient agrees to fully cooperate in all audits the Secretary, Inspector General, or Pandemic Response Accountability Committee conducts to ensure compliance with these Terms and Conditions.

- The Recipient agrees that all claims it submits will be full and complete (i.e., no interim bills or corrected claims). The Recipient acknowledges that all payments are final and there will be no adjustments.

- The Secretary will reimburse the Recipient generally at 100 percent of Medicare rates (including any amounts that would have been due to the provider as patient cost sharing) for the items and services that Respondent provided to Uninsured Individuals for which the Recipient submits claims to the Relief Fund unless otherwise noted. If there is no Medicare standard rate, a calculated average rate will be used. Exclusions from coverage and alternatives to where Medicare rates do not apply are outlined in the program details.

- The Recipient certifies that it will not engage in "balance billing" or charge any type of cost sharing for any items or services provided to Uninsured Individuals receiving a COVID-19 vaccination or care or treatment for a positive diagnosis of COVID-19 for which the Recipient receives a Payment from the Relief Fund. The Recipient must not sell or seek reimbursement from an Uninsured Individual for any COVID-19 vaccine and any adjuvant, syringes, needles, or other constituent products and ancillary supplies that the federal government provides at no cost to the Recipient. The Recipient shall consider Payment received from the Relief Fund to be payment in full for such COVID-19 vaccine, care, or treatment.

- If the Recipient, prior to signing these Terms and Conditions, charged any Uninsured Individuals a fee relating to COVID-19 vaccination, care, or treatment for which the Recipient subsequently received a Payment from the Relief Fund, the Recipient will communicate to the Uninsured Individuals that they do not owe Recipient any money for the items or services relating to that COVID-19 vaccination, care, or treatment. If an Uninsured Individual paid the Recipient for any portion of such vaccination, care, or treatment, the Recipient will timely return the payment to the Uninsured Individual.

The following statutory provisions also apply:

**General Provisions in FY 2020 Consolidated Appropriation**

**SEC. 202. Executive Pay.** None of the funds appropriated in this title shall be used to pay the salary of an individual, through a grant or other extramural mechanism, at a rate in excess of Executive Level II.

**SEC. 210. Funding Prohibition for Gun Control Advocacy**. None of the funds made available in this title may be used, in whole or in part, to advocate or promote gun control.

## SEC. 503. Lobbying

(a) No part of any appropriation contained in this Act or transferred pursuant to section 4002 of Public Law 111–148 shall be used, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, for the preparation, distribution, or use of any kit, pamphlet, booklet, publication, electronic communication, radio, television, or video presentation designed to support or defeat the enactment of legislation before the Congress or any State or local legislature or legislative body, except in presentation to the Congress or any State or local legislature itself, or designed to support or defeat any proposed or pending regulation, administrative action, or order issued by the executive branch of any State or local government, except in presentation to the executive branch of any State or local government itself.

(b) No part of any appropriation contained in this Act or transferred pursuant to section 4002 of Public Law 111–148 shall be used to pay the salary or expenses of any grant or contract recipient, or agent acting for such recipient, related to any activity designed to influence the enactment of legislation, appropriations, regulation, administrative action, or Executive order proposed or pending before the Congress or any State government, State legislature or local legislature or legislative body, other than for normal and recognized executive-legislative relationships or participation by an agency or officer of a State, local or tribal government in policymaking and administrative processes within the executive branch of that government.

(c) The prohibitions in subsections (a) and (b) shall include any activity to advocate or promote any proposed, pending or future Federal, State or local tax increase, or any proposed, pending, or future requirement or restriction on any legal consumer product, including its sale or marketing, including but not limited to the advocacy or promotion of gun control.

## SEC. 506. Prohibits Use of Federal Funds for Abortions.

(a) None of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for any abortion.

(b) None of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for health benefits coverage that includes coverage of abortion.

(c) The term ''health benefits coverage'' means the package of services covered by a managed care provider or organization pursuant to a contract or other arrangement.

## SEC. 507 Limitations on Abortion Funding Prohibition

(a) The limitations established in the preceding section shall not apply to an abortion—

(1) if the pregnancy is the result of an act of rape or incest; or

(2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy

itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.

(b) Nothing in the preceding section shall be construed as prohibiting the expenditure by a State, locality, entity, or private person of State, local, or private funds (other than a State's or locality's contribution of Medicaid matching funds).

(c) Nothing in the preceding section shall be construed as restricting the ability of any managed care provider from offering abortion coverage or the ability of a State or locality to contract separately with such a provider for such coverage with State funds (other than a State's or locality's contribution of Medicaid matching funds).

(d)(1) None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.

(2) In this subsection, the term ''health care entity'' includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan.

### SEC. 508. Prohibits Use of Funds for Embryo Research

(a) None of the funds made available in this Act may be used for—

(1) the creation of a human embryo or embryos for research purposes; or

(2) research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 CFR 46.204(b) and section 498(b) of the Public Health Service Act (42 U.S.C. 289g(b)).

(b) For purposes of this section, the term ''human embryo or embryos'' includes any organism, not protected as a human subject under 45 CFR 46 as of the date of the enactment of this Act, that is derived by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes or human diploid cells.

### SEC. 509. Prohibits Promotion of Legalization of Controlled Substances

(a) None of the funds made available in this Act may be used for any activity that promotes the legalization of any drug or other substance included in schedule I of the schedules of controlled substances established by section 202 of the Controlled Substances Act except for normal and recognized executive-congressional communications.

(b) The limitation in subsection (a) shall not apply when there is significant medical evidence of a therapeutic advantage to the use of such drug or other substance or that federally sponsored clinical trials are being conducted to determine therapeutic advantage.

**SEC. 515. (b) Prohibits Asking Candidates for Federal Scientific Advisory Committees Their Political Affiliations; Prohibits Distribution of Intentionally False Information**

(b) None of the funds made available in this Act may be used to disseminate information that is deliberately false or misleading.

**SEC. 520. Pornography.**

(a) None of the funds made available in this Act may be used to maintain or establish a computer network unless such network blocks the viewing, downloading, and exchanging of pornography.

(b) Nothing in subsection (a) shall limit the use of funds necessary for any Federal, State, tribal, or local law enforcement agency or any other entity carrying out criminal investigations, prosecution, or adjudication activities.

**SEC. 521. Prohibits Funding ACORN or Its Affiliates or Subsidiaries.** None of the funds made available under this or any other Act, or any prior Appropriations Act, may be provided to the Association of Community Organizations for Reform Now (ACORN), or any of its affiliates, subsidiaries, allied organizations, or successors.

**SEC. 527. Prohibits Federal Funding for Needle Exchange Except in Limited Circumstances.** Notwithstanding any other provision of this Act, no funds appropriated in this Act shall be used to purchase sterile needles or syringes for the hypodermic injection of any illegal drug: *Provided*, That such limitation does not apply to the use of funds for elements of a program other than making such purchases if the relevant State or local health department, in consultation with the Centers for Disease Control and Prevention, determines that the State or local jurisdiction, as applicable, is experiencing, or is at risk for, a significant increase in hepatitis infections or an HIV outbreak due to injection drug use, and such program is operating in accordance with State and local law.

**Government-wide General Provisions**

**SEC. 718. Propaganda.** No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.

**SEC. 732. Privacy Act.** None of the funds made available in this Act may be used in contravention of section 552a of title 5, United States Code (popularly known as the Privacy Act), and regulations implementing that section.

**SEC. 742. Confidentiality Agreements**.

(a) None of the funds appropriated or otherwise made available by this or any other Act may be available for a contract, grant, or cooperative agreement with an entity that requires employees or contractors of such entity seeking to report fraud, waste, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contactors from

lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(b) The limitation in subsection (a) shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

## SEC. 743. Nondisclosure Agreements

(a) No funds appropriated in this or any other Act may be used to implement or enforce the agreements in Standard Forms 312 and 4414 of the Government or any other nondisclosure policy, form, or agreement if such policy, form, or agreement does not contain the following provisions: "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this SEC. 743. (a) No funds appropriated in this or any other Act may be used to implement or enforce the agreements in Standard Forms 312 and 4414 of the Government or any other nondisclosure policy, form, or agreement if such policy, form, or agreement does not contain the following provisions: "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.": *Provided*, That notwithstanding the preceding provision of this section, a nondisclosure policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure forms shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

(b) A nondisclosure agreement may continue to be implemented and enforced notwithstanding subsection (a) if it complies with the requirements for such agreement that were in effect when the agreement was entered into.

(c) No funds appropriated in this or any other Act may be used to implement or enforce any agreement entered into during fiscal year 2014 which does not contain substantially similar language to that required in subsection (a).

**SEC. 744. Unpaid Federal Tax Liability**. None of the funds made available by this or any other Act may be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and has made a determination that this further action is not necessary to protect the interests of the Government.

**SEC. 745. Criminal Felony Limitation.** None of the funds made available by this or any other Act may be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and has made a determination that this further action is not necessary to protect the interests of the Government.

### Other Appropriations Provisions

**42 U.S.C. 289d note** No funds appropriated under this Act or subsequent Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Acts shall be used by the National Institutes of Health, or any other Federal agency, or recipient of Federal funds on any project that entails the capture or procurement of chimpanzees obtained from the wild. For purposes of this section, the term 'recipient of Federal funds' includes private citizens, corporations, or other research institutions located outside of the United States that are recipients of Federal funds.

### Other Statutory Provisions

**Trafficking in Persons**
This award is subject to the requirements of Section 106(g) of the Trafficking Victims Protection Act of 2000, as amended (22 U.S.C. 7104)

*a. Provisions applicable to a recipient that is a private entity.*
1. You as the recipient, your employees, subrecipients under this award, and subrecipients' employees may not
   i.   Engage in severe forms of trafficking in persons during the period of time that the award is in effect;
   ii.  Procure a commercial sex act during the period of time that the award is in effect; or
   iii. Use forced labor in the performance of the award or subawards under the award.

2. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if you or a subrecipient that is a private entity –

i. Is determined to have violated a prohibition in paragraph a.1 of this award term; or

ii. Has an employee who is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph a.1 of this award term through conduct that is either-

A. Associated with performance under this award; or

B. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 376.

*b. Provision applicable to a recipient other than a private entity.*

We as the Federal awarding agency may unilaterally terminate this award, without penalty, if a subrecipient that is a private entity-

1. Is determined to have violated an applicable prohibition in paragraph a.1 of this award term; or

2. Has an employee who is determined by the agency official authorized to terminate the award to have violated an applicable prohibition in paragraph a.1 of this award term through conduct that is either

i. Associated with performance under this award; or

ii. Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 376

*c. Provisions applicable to any recipient.*

1. You must inform us immediately of any information you receive from any source alleging a violation of a prohibition in paragraph a.1 of this award term

2. Our right to terminate unilaterally that is described in paragraph a.2 or b of this section:

i. Implements section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended (22 U.S.C. 7104(g)), and

ii. Is in addition to all other remedies for noncompliance that are available to us under this award.

3. You must include the requirements of paragraph a.1 of this award term in any subaward you make to a private entity.

*d. Definitions.* For purposes of this award term:

1. "Employee" means either:

i. An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or

ii. Another person engaged in the performance of the project or program under this award and not compensated by you including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing or matching requirements.

2. "Forced labor" means labor obtained by any of the following methods: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

3. "Private entity":
i. Means any entity other than a State, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR 175.25.
ii. Includes:
A. A nonprofit organization, including any nonprofit institution of higher education, hospital, or tribal organization other than one included in the definition of Indian tribe at 2 CFR 175.25(b).
B A for-profit organization.
4. "Severe forms of trafficking in persons," "commercial sex act," and "coercion" have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102)

**Whistleblower Protections**
You are hereby given notice that the 48 CFR section 3.908, implementing section 828, entitled "Pilot
Program for Enhancement of Contractor Employee Whistleblower protections," of the National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2013 (Pub. L. 112-239, enacted January 2,
2013) applies to this award.

**Human Subjects Protections**
If any activities under this project will involve human subjects in any research activities, you must provide satisfactory assurance of compliance with the participant protection requirement of the HHS/OASH Office of Human Research Protection (OHRP) prior to implementation of those research components. This assurance should be submitted to the OHRP in accordance with the appropriate regulations.

**Fraud, Abuse and Waste**:
The HHS Inspector General accepts tips and complaints from all sources about potential fraud, waste, abuse, and mismanagement in Department of Health and Human Services' programs. Your information will be reviewed promptly by a professional staff member. Due to the high volume of information that they receive, they are unable to reply to submissions. You may reach the OIG through various channels.
Internet: https://forms.oig.hhs.gov/hotlineoperations/index.aspx
Phone: 1-800-HHS-TIPS (1-800-447-8477)
Mail: US Department of Health and Human Services
Office of Inspector General
ATTN: OIG HOTLINE OPERATIONS
PO Box 23489
Washington, DC 20026
For additional information visit https://oig.hhs.gov/fraud/report-fraud/index.asp

# EXHIBIT D

Health Resources & Services
Administration

Bureaus and Offices | Newsroom | Contact HRSA

MENU

# FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration

**Catalog of Federal Domestic Assistance number (CFDA): 93.461**

## Search FAQs:

Categories | Search FAQs | Search

## General Questions

### What is the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program?

### How much money is available in the fund?



### Who is administering the program?

# Eligibility Questions

### Who is eligible for funding?

### Can health care providers submit claims for unaccompanied children, including both children who enter the country without their parent or legal guardian and children who for other reasons have been separated from their parent or legal guardian?

### Who is considered to be an "uninsured individual" for purposes of providers requesting reimbursement for testing, treatment, or vaccine administration?

For claims for COVID-19 testing and testing-related items and services, treatment of positive cases of COVID-19, and vaccine administration claims, a patient is considered uninsured if the patient did not have any health care coverage at the time services were rendered.

### Can health care providers submit claims for uninsured individuals who are undocumented?

### How does the HRSA COVID-19 Uninsured Program process claims for Medicaid enrollees who have limited Medicaid benefits (e.g., those enrolled in Medicaid for family planning benefits)?

**Do health care providers need to determine if an otherwise uninsured individual is Medicaid eligible?**

**What is the difference between the funds available to reimburse providers for COVID-19 testing, treatment, and vaccine administration services furnished to uninsured individuals through the Health Resources and Services Administration (HRSA) and the funds available through the Families First Coronavirus Response Act (FFCRA) to provide Medicaid coverage of COVID-19 testing services for uninsured individuals?**

**Which type of health care providers are eligible for reimbursement under this program? Are non-profits or Federally Qualified Health Centers (FQHCs) eligible?**

**Do Health Center Program requirements restrict or limit health centers in submitting claims for reimbursement to the HRSA COVID-19 Uninsured Program?**

**The Ryan White HIV/AIDS Program is a payer of last resort, would these program funds be considered a payer before this fund?**

**Are Indian Health Service (IHS), Tribal and Urban Indian Program (I/T/Us) beneficiaries considered "uninsured individuals" for purposes of the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program?**

Case 5:25-cv-00642-D     Document 1-2     Filed 10/09/25     Page 44 of 58

## How does the HRSA COVID-19 Uninsured Program differ from the HRSA COVID-19 Coverage Assistance Fund?

### What if a provider submitted a claim to the HRSA COVID-19 Uninsured Program and the patient is actually underinsured?

If a claim was submitted to the HRSA COVID-19 Uninsured Program for a patient who was actually insured, the provider should receive a notice that the claim was not eligible for reimbursement. If the claim was for COVID-19 vaccine administration and the patient's health plan either did not include COVID-19 vaccination as a covered benefit or covered COVID-19 vaccination but with cost-sharing, then the provider could instead submit the claim to the **HRSA COVID-19 Coverage Assistance Fund**. Prior to submitting a claim to the Coverage Assistance Fund, the provider should first submit the claim to the individual's health insurance plan for payment. Only those COVID-19 vaccine administration claims denied or not fully paid by a patient's health insurance plan, including those insurance plans with patient co-pays for vaccine administration, deductibles for vaccine administration, or co-insurance related to COVID-19 vaccination, are eligible for reimbursement by the HRSA COVID-19 Coverage Assistance Fund.

### What services are eligible for reimbursement?

### Why is claim reimbursement eligibility for diagnostic testing services performed by independent labs different than claim reimbursement eligibility for such services performed by hospitals (including hospital labs) or physicians?

Case 5:25-cv-00642-D     Document 1-2     Filed 10/09/25     Page 45 of 58

**Can health care providers submit a claim for testing furnished to an uninsured individual that is performed by a laboratory with which it has a client bill arrangement?**

**What services are ineligible for reimbursement?**

**Are claims subject to timely filing limits?**

**Are diagnostic testing and testing-related visits eligible for reimbursement if the result of the COVID-19 test is negative?**

**If a provider tests for COVID-19 as part of pre-operative or other medical treatment unrelated to COVID-19, is the test eligible for reimbursement?**

**If a patient presents to the emergency department with cough and fever and then tested negative for COVID-19, would the test and the emergency room visit be eligible for reimbursement?**

**Can funds be used for remote screening activities even if they do not administer an actual test?**

**The Terms and Conditions for the Uninsured Treatment pool of funding indicate that providers can request claims for reimbursement for care or treatment related to positive diagnoses of COVID-19. To qualify as a positive diagnosis of COVID-19, does the primary diagnosis on a claim for treatment need to be B97.29 or U07.1?**

**Prior to the April 1, 2020, effective date for U07.1 COVID-19 diagnosis, the program guidelines indicate that treatment would be eligible for reimbursement if B97.29 is the primary diagnosis. Can B97.29 be used for a primary diagnosis?**

**Are ambulance providers and other emergency medical service providers eligible for reimbursement for treatment services? Will claims for presumptive diagnoses be eligible for reimbursement under this program?**

**Could a provider submit for reimbursement from the Health Resources and Services Administration (HRSA) COVID-19 Claims Reimbursement to Health Care Providers and Facilities for COVID-19 Testing, Treatment, and Vaccine Administration for the Uninsured Program (referred to as the HRSA COVID-19 Uninsured Program) claims for cost-sharing for testing, treatment, or COVID-19 vaccine administration fees furnished for enrollees in Marketplace coverage in months 2 and 3 of the grace period applicable for enrollees receiving advance payments of the premium tax credit?**

# Payment Questions

**Will the HRSA COVID-19 Uninsured Program provide claims reimbursement for monoclonal antibody therapy?**

Case 5:25-cv-00642-D     Document 1-2     Filed 10/09/25     Page 47 of 58

## How do eligible providers receive funding?

## What is the timeline for requesting and receiving reimbursement?

## How do eligible providers submit claims?

## What type of unique identifiable identification information is required when submitting patient information?

## If a temporary member ID is valid for 120 days, can providers still submit a claim after the 120-day period is over?

## Can providers submit a paper reimbursement request and/or request reimbursement via check?

## Do providers have to pay back the funding they received?

## How are the reimbursement rates determined?

## Given the Uninsured program is paid generally at Medicare rates, does reimbursement include the 20% add-on to the Medicare diagnosis related group (DRG) payment for COVID-19 treatment?

**If a provider already received payment from an uninsured individual, are they required to reimburse that individual after receiving payment from the program?**

**When I submit a claim as part of the HRSA COVID-19 Uninsured Program, will I receive an 835 file through my clearinghouse to help me review the amount paid on each submitted claim? If not, where should I go to receive the associated claims payment information?**

**When I tried to enter my TIN in the program portal, I received a message that said the TIN already has a program administrator, and the person listed no longer works at my organization. How do I change the TIN administrator?**

# Compliance Questions

**How should providers account for these funds for purposes of cost reports and similar reports?**

# Pharmacy Questions

**What types of claims does the Uninsured Program (UIP) accept? Are National Council for Prescription Drug Programs (NCPDP) claims accepted?**

**What is a clearinghouse?**

**To participate in the Uninsured Program (UIP), are all steps completed in the program portal?**

**Do all tabs need to be completed on the provider roster?**

**Is Optum Pay™ the same as OptumRx®?**

**Are pharmacies/pharmacists that administer COVID-19 tests or vaccines eligible providers for reimbursement under the program?**

[Return to top](#)

## Sign up for email updates.     Subscribe

**Report on Your Use of Funds**

**PRF Reporting Portal**

## Quick Links

Terms and Conditions

Download all PRF FAQs (PDF - 538 KB)

Application and Attestation Portal

Returning Funds Portal

**Provider Support Line**

(866) 569-3522
(TTY: 711)

Accessibility | Disclaimers | Freedom of Information Act | Health and Human Services | No FEAR Act |
Privacy Policy | USA.gov | Viewers & Players | Vulnerability Disclosure Policy | WhiteHouse.gov

# EXHIBIT E

 **Health Resources & Services Administration**

## ⓘ Frequently Asked Questions

Based on user feedback from this site and recent program webcasts, we have identified and answered your top questions to ensure this process is as simple and easy to use as possible. Please see our **frequently asked questions (/frequently-asked-questions.html)**.

HRSA COVID-19 Uninsured Program Portal:    **Sign In**    (/registration)

Banner



## HRSA
# COVID-19 Claims Reimbursement

**to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured**



## Patient Details

Uninsured individuals in the U.S. without health care coverage are eligible. To document patient eligibility, providers will need to submit unique identifiable information about uninsured individuals as determined by HRSA (subject to adjustment as necessary).



**Validate TIN**

1-2 business days

Case 3:25-cv-00642-D    Document 1-2    Filed 10/09/25    Page 53 of 58



**Add Provider Roster**

5-7 business days



**Set Up Optum Pay ACH**

7-10 business days



**Add and Attest
to Patient Roster**

Up to 5 business days



**Submit Claims**

1-4 business days



**Receive Electronic
Payment**

Approximately 10 business days

*The above timeline is an estimate and may vary.*

Once a TIN is validated and set up with Optum Pay, claims that are eligible for reimbursement are typically processed and paid within 30 business days subject to availability of funds.

## 1. Enter Patient Information

Case 5:25-cv-00642-D   Document 1-2   Filed 10/09/25   Page 54 of 58

Complete patient attestation and upload patient roster with the following information:

**You Will Need**

- First and last name

- Date of birth

- Gender

- *SSN and state of residence; if not available, enter state identification / driver's license

- Date of service for professional, institutional outpatient services

- Date of admission and date of discharge for institutional inpatient services

- **Address

- Middle initial (optional)

- Patient account number (optional)

- Race/Ethnicity (optional)

*A SSN and state of residence, or state identification / driver's license is needed to verify patient eligibility. If a and state of residence, or state identification / driver's license is not submitted, you will need to attest that you attempted to capture this information before submitting a claim and the patient did not have this information at the time of service, or that you did not have direct contact with the patient and thus did not have an opportunity to attempt to capture this information.

**If the individual is unable or unwilling to provide their address, please add the address of the facility where the care was provided or other location that may be appropriate (e.g., shelter).

**Attestation**

As part of this step, if you have direct contact with the patient, you should make best efforts to confirm that the patient was uninsured at the time the services were provided (i.e., for claims for COVID-19 Testing and Testing-Related Items and Services, verify that the patient does not have coverage through an individual or employer-sponsored plan, a federal health care program, or the Federal Employees Health Benefits Program; for claims for treatment of a COVID-19 diagnosis, verify that the patient did not have any health care coverage; for COVID-19

Case 5:25-cv-00642-D     Document 1-2     Filed 10/09/25     Page 55 of 58

vaccine administration, verify that the patient did not have any health care coverage). If you do not have direct patient contact, you may rely on the attestation of the ordering health care provider that the patient's health coverage status is uninsured.

 **User Guide Available** ↗ (https://chameleoncloud4.io/review/prod/634121a7-5b88-4ba7-8d90-17c7bcf594f3)

 **Video**
**How to add a Patient Roster (demonstration)** ↗ (static/20024F-UHC-CORP-Updated Patient Roster_FINAL_1080.mp4)

## 2. Submit Patient Information

**Submit patient information in one of the following ways:**

- One patient at a time

- Batch file upload

    - **Download Sample CSV** (static/PatientRosterTemplate.csv)

    - **Sample File Specification (PDF)** (static/Patient Roster File Format Specification_HRSA COVID-19 Uninsured Program.pdf)

(https

## 3. Receive Temporary Member ID

  Claims can still be submitted after the date of validity, but the temporary member ID must be eligible for the date of service or admittance.

Receive a temporary member ID for each individual after submitting patient information, which will be displayed in the program portal in up to 5 business days.

**For professional and institutional outpatient** – Temporary member ID will be valid for 120 days from date of service. Eligible claims can be submitted using the temporary member ID with date of service within the validity period. For example, if Patient A had a date of service of February 4, 2020, then the temporary ID assigned to her will be valid from February 4, 2020, through June 3, 2020.

**For institutional inpatient** – Temporary member ID will be valid from date of admission and expire 120 days from date of discharge. Eligible claims can be submitted using the temporary member ID with date of admission and date of discharge within the validity period. For example, if Patient B had a date of admission of February 4, 2020,

Case 5:25-cv-00642-D    Document 1-2    Filed 10/09/25    Page 56 of 58

and date of discharge of February 20, 2020, then the temporary member ID assigned to him will be valid from February 4, 2020, through June 19, 2020.

*Note*: If an uninsured individual was treated in the ER before being admitted as an inpatient, use the date of admittance to the ER as the inpatient admittance date.

**Note** – A temporary member ID **will not be issued** if active coverage is identified. If a provider believes this coverage information is outdated or not applicable, they may request **reconsideration of eligibility (/#)**.

 **User Guide Available** ⧉ **(https://chameleoncloud4.io/review/prod/634121a7-5b88-4ba7-8d90-17c7bcf594f3)**

For status updates on TIN validation, provider roster verification and Optum Pay™ account setup, check the provider dashboard on the main page of the program portal.

**Sign In** ⧉ **(/registration)**

After receiving a temporary member ID, you will be able to start submitting claims for reimbursement.

**Go To Claims & Reimbursement    (/claims-and-reimbursement.html)**

(https

## Customer Support

Our service staff members are available to provide real-time technical support, as well as service and payment support. Hours of operation are 8 a.m. to 4 p.m. Central Time, Monday through Friday.

**Provider Support Line: 866-569-3522 (tel:18665693522) for** TTY dial 711 **(tel:711)**

## We're listening

We are committed to making the HRSA COVID-19 Uninsured Program as simple and accessible as possible. We are also monitoring your inquiries and working hard to answer your questions. Let us know how we're doing, and we'll update our resources based on your input.

**Submit Feedback    (https://providercaresus.iad1.qualtrics.com/jfe/form/SV_0feRYFNOmdAoBZH)**

**Important Information**

**COVID-19 Uninsured Program** ☑ **(https://www.hrsa.gov/coviduninsuredclaim)**
**Educational Tools (/educational-tools.html)**
**Vulnerability Disclosure Policy (VDP)** ☑ **(https://www.hhs.gov/vulnerability-disclosure-policy/index.html)**

---

**Terms and Conditions**

**Uninsured Program Terms and Conditions (PDF) (static/The Uninsured Program Terms and Conditions.pdf)**

---

**Accessibility**

**Accessibility Statement** ☑ **(https://coviduninsuredclaim-stage.linkhealth.com/registration/accessibility-statement)**

Optum Pay™ is provided/made possible by OptumHealth Financial Services and its subsidiary Optum Bank, Inc., Member FDIC.

© 2025 UnitedHealth Group, Inc. All rights reserved.

Terms Of Use ☑ (https://coviduninsuredclaim-stage.linkhealth.com/registration/terms-of-use) |

Privacy Policy ☑ (https://coviduninsuredclaim-stage.linkhealth.com/registration/privacy-policy)

Feedback

POWERED BY
**UNITEDHEALTH GROUP®**



(https